IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| NATIONAL CORPORATE HOUSING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 1:11-cv-1391 (AJT-TCB) |
| DIANE L. AYRES and JANET M. ZAMECNIK, | ) ) ) | |
| Defendants. | ) ) | |

## **MEMORANDUM OPINION**

In June 2011, Defendants Diane L. Ayres ("Ayres") and Janet M. Zamecnik ("Zamecnik") (collectively, "Defendants") were working in Ohio when they learned that their then-employer, Equity Corporate Housing, Inc. ("Equity"), an Ohio-based company, had been sold to plaintiff National Corporate Housing, Inc. ("NCH"), a company with its principal place of business in Virginia. Neither Defendant had played any role in soliciting, negotiating or approving that business transaction. Following that purchase, Defendants agreed to work for NCH in Ohio (without any written employment agreements) essentially to continue doing for NCH what they were doing for Equity. During the course of the approximately six months that Defendants were NCH employees, they never travelled to Virginia, but in order to perform the duties of their employment, did on various occasions communicate with NCH employees located in Virginia as well as some NCH customers and vendors located in Virginia. They also utilized NCH's Virginia-based computer network and other of NCH's Virginia-based support services.

In early December 2011, Defendants terminated their employment with NCH; and on December 23, 2011, NCH filed in this Court a fourteen count complaint against them, alleging

various breaches of contract and fiduciary duty, conspiracy, misappropriation of allegedly protectable information and various torts, including interference with actual and prospective customer contracts.[1]  On January 31, 2012, Defendants filed pursuant to Fed. R. Civ. P. 12(b)(2) a Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 6), which Plaintiff has opposed. A hearing was held on March 2, 2012, following which the Court took the motion under advisement.

This case requires the Court to determine whether, for the purposes of adjudicating NCH's claims, Defendants submitted themselves to personal jurisdiction in Virginia by accepting employment with NCH, performing their NCH-assigned employment duties or engaging in certain alleged post-termination conduct.  For the reasons stated below, the Court concludes that this Court lacks personal jurisdiction over Defendants; and Defendants' Motion to Dismiss will be granted.

## I.     BACKGROUND

Based on the allegations of the complaint and the parties' submissions in connection with Defendants' motion to dismiss, the Court has considered the following factual allegations:[2]

Plaintiff NCH is a Delaware corporation with its principal place of business in Herndon,

---

[1] Plaintiff's claims are (1) breach of fiduciary duty (Counts I and II); (2) aiding and abetting breach of fiduciary duty (Counts III and IV); (3) tortious interference with business expectancy (Count V); (4) statutory business conspiracy (Count VI); (5) civil conspiracy (Count VII); (6) violation of Virginia Uniform Trade Secrets Act (Count VIII); (7) conversion (Count IX); (8) unjust enrichment (Count X); (9) infringement of federally registered trademark (Count XI); (10) federal unfair competition, false designation of origin, and false description (Count XII); (11) federal trademark dilution (Count XIII); and (12) common law trademark infringement and unfair competition (Count XIV).  NCH seeks injunctive relief, compensatory damages, treble damages, and attorneys' fees and costs.

[2] For the purposes of a Rule 12(b)(2) motion, the Court may consider facts presented beyond the allegations of the Complaint.  *United States v. Maxwell*, 189 F. Supp. 2d 395, 398 (E.D. Va. 2002).  *See also Wilson-Cook Medical, Inc. v. Wilson*, 942 F.2d 247, 252 (4th Cir. 1991) (cited in *African Dev. Co., Ltd. v. Keene Eng'g, Inc.*, 963 F. Supp. 522, 524 (E.D. Va. 1997)).

Virginia. Compl. at ¶ 3. NCH provides corporate housing and related rental assistance to customers throughout the country. *Id.* NCH's customers are typically either large corporations that contract directly with NCH for rental assistance services or relocation companies that contract with NCH on behalf of corporations for such services. *Id.* at ¶ 15. At all material times herein, NCH was in the business of providing corporate housing and related services to customers throughout the United States, and had its own well-developed national platform with significant federal government, government contractor, and other business in Virginia. *See* Compl. at ¶ 20; Aff. of Diane L. Ayres, attached as Ex. 1 to Mot. to Dismiss, at ¶ 13; Aff. of Janet M. Zamecnik, attached as Ex. 2 to Mot. to Dismiss, at ¶ 13.

Defendant Diane L. Ayres is a citizen and resident of Ohio, and the President and owner of PorchLight Apartment Rental Service, LLC ("PorchLight"), an apartment rental assistance business organized under the laws of the State of Ohio, with its principal place of business in Ohio. Compl. at ¶ 4; Ayres Aff. at ¶ 3, 5. Defendant Janet M. Zamecnik is a citizen and resident of Ohio, and the Vice President and an owner of PorchLight. Compl. at ¶ 5; Zamecnik Aff. at ¶¶ 3, 20.

On February 15, 2006, PorchLight sold substantially all of its assets to Equity, the national corporate housing affiliate of Equity Residential, a public company listed on the New York Stock Exchange, operating in offices throughout the country, with its headquarters in Ohio. Compl. at ¶ 8; Asset Purchase Agreement Between Equity Corporate Housing, Inc. and Porchlight Apartment Rental Service, LLC, attached as Exhibit A to Ayres Aff., at 4. As a result of that asset purchase, Ayres and Zamecnik became employed by Equity in the rental assistance division that Equity had acquired from PorchLight, renamed Equity Rental Solutions. Compl. at ¶¶ 11-13, 21-22; Ayres Aff. at ¶ 8; Zamecnik Aff. at ¶ 8. While employed by Equity, both Ayres

and Zamecnik performed services for Equity from their homes and offices in Ohio.  Ayres Aff. at ¶ 9; Zamecnik Aff. at ¶ 9.

On June 3, 2011, NCH purchased substantially all of the corporate housing assets of Equity. *Id.* at ¶¶ 8, 10.  Also on June 3, 2011, as a result of NCH's purchase of Equity's assets, including the division that employed Ayres and Zamecnik, Ayres and Zamecnik became employees of NCH.  Compl. at ¶¶ 11-13, 21-22; Ayres Aff. at ¶¶ 11-14; Zamecnik Aff. at ¶¶ 11-14.  Neither Ayres nor Zamecnik solicited the purchase by NCH or participated in any negotiations pertaining to the purchase or approved the purchase.  Neither entered into any written employment contract or any restrictive covenants with NCH.  Ayres Aff. at ¶ 14; Zamecnik Aff. at ¶ 14.  Approximately six months into their employment with NCH, Defendants resigned from NCH, Ayres on December 1, 2011, and Zamecnik on December 5, 2011.  Compl. at ¶¶ 38, 42, 45; Ayres Aff. at ¶ 18; Zamecnik Aff. at ¶ 18.

During the time they were employed by NCH and solely in their capacity as NCH employees, Ayres and Zamecnik were provided access to NCH's allegedly confidential and proprietary information, including information regarding Virginia-based customers, prospective customers, vendors, and other valuable business relationships.  Compl. at ¶ 25; Ayers Aff. at ¶ 16; Zamecnik Aff. at ¶ 16; Aff. of Gregory Lakatos, filed with Opp'n, at ¶ 6-8; Aff. of Laura Panganis, filed with Opp'n, at ¶ 3.  At least eleven "important" NCH corporate and relocation company rental-assistance customers were headquartered and/or located in Virginia; and Ayres and Zamecnik, or other employees acting under their supervision, had contacts with some of NCH's Virginia-based customers.  Compl. at ¶ 26, 27; Ayres Aff. at ¶ 16; Zamecnik Aff. at ¶ 16.  In that connection, NCH's nationwide network of broker and touring agent vendors includes at least nine Virginia-based companies, *see* Compl. at ¶ 28, and Ayres and Zamecnik, or employees

4

working under their supervision and direction, regularly had multiple communications with each of these NCH touring agent vendors, including communications about tours that had been conducted and upcoming tours that were, or needed to be, scheduled in Virginia. Opp'n at 4.

As part of their job duties at NCH, Defendants also reviewed the performance and quality of the tours provided by certain NCH vendors and followed up with both the vendor and NCH's Controller in Herndon, Virginia, and other members of NCH's Virginia-based financial and accounting teams regarding the handling of invoices and timing of payment to these vendors. Aff. of Greg Ryan, filed with Opp'n, at ¶ 7-10. For example, in October 2011, Ayres and Zamecnik, individually or together with other NCH employees acting under their supervision, contracted on NCH's behalf with a vendor in Charlottesville, Virginia, to conduct tours for two employees of Virginia-based Norfolk Southern, who were transferring to Virginia. Opp'n at 4, 17. They then had several additional communications with both the vendor in Charlottesville and NCH's Controller in Herndon, Virginia regarding the vendor's invoices and payment status. Compl. at ¶ 29.

During their employment, Ayres and Zamecnik were also provided access to NCH's considerable internal resources, including accounting, financial, marketing, information technology ("IT"), and other administrative and operational assistance from NCH employees located in Virginia. Ryan Aff. at ¶ 7-10; Lakatos Aff. at ¶ 3-4. Ayres and Zamecnik regularly relied on NCH's financial and accounting teams, which primarily consisted of NCH employees based in NCH's Virginia headquarters who handled invoicing, collection, payment, and other financial and accounting issues relating to NCH's rental assistance division. Compl. at ¶ 31; Ayres Aff. at ¶ 17; Zamecnik Aff. at ¶ 17; Ryan Aff. at ¶ 7-10. Ayres and Zamecnik communicated with NCH's controller and other members of NCH's financial and accounting

team in Herndon, Virginia on at least a weekly, if not daily, basis regarding invoices, vendor payments, outstanding payables, requests for checks and expedited payments, and office rental payments. Ryan Aff. at ¶ 9-10; Ayres Aff. at ¶ 17; Zamecnik Aff. at ¶ 17. Most of these communications were by e-mail, but some were by telephone. Ryan Aff. at ¶ 9-10.

NCH's IT resources used by Ayres and Zamecnik were also based in Herndon, Virginia; Ayres and Zamecnik relied on the NCH computer network and servers located in Herndon, Virginia for their daily use of emails with Ayres receiving about 150 daily emails and Zamecnik receiving about 60 daily emails, all of which were routed through NCH's Virginia servers before arriving in Ayres' and Zamecnik's inboxes. Lakatos Aff. at ¶ 5, 9 and 11. They also contacted NCH IT employees to handle issues they had regarding e-mail and access to other information secured on NCH's servers. Compl. at ¶ 32; Zamecnik Aff. at ¶ 17; Lakatos Aff. at ¶ 3-4. Since in or around October 2011, this Virginia-based computer network has housed the OSCAR integrated system, which Ayres and Zamecnik accessed (facilitated by the Virginia-based servers) in the course of their employment with NCH, and which contains much of the financial and other confidential data that Ayres and Zamecnik are alleged to have misappropriated for their benefit or used to interfere with NCH's existing contractual and business relationships. Compl. at ¶ 47-49, 52; Ryan Aff. at ¶ 4-5, 8; Lakatos Aff. at ¶ 5-8.

Overall, Ayers estimates that during her employment with NCH, she had 12 communications by email or telephone with NCH's controller, initiated and maintained communications with six NCH customers located in Virginia, had several communications with vendors, and had additional contacts and communications with Virginia "resident persons or entities for whom NCH performed services." Ayres Aff. at ¶¶ 16-17. Zamecnik estimates that during her NCH employment, fewer than 3% of the business "requests" she handled involved

6

any contact with Virginia. Zamecnik Aff. at ¶ 16. More specifically, she affirms that she had 20 to 40 communications with the NCH controller, two telephone calls with an NCH employee regarding IT issues, and communications with six Virginia-based vendors who initiated contact with her regarding overdue payments. *Id.*

With respect to Defendants' post-termination conduct, NCH alleges that Ayres and Zamecnik, individually or together with employees acting under their supervision, solicited from certain NCH Virginia based customers pending NCH Virginia rental-assistance projects, and converted them for their and PorchLight's benefit. Compl. at ¶¶ 47-49. Specifically, NCH claims that on December 7, 2011, Ayres sent an announcement to NCH's broker and touring agent vendors in Virginia and other states accusing NCH and Equity of having breached unspecified contract terms, claiming that PorchLight was the better rental-assistance company to partner with, and asserting that PorchLight would continue to pay the same tour rates that NCH and Equity had paid them. Compl. at ¶ 52. With respect to her post-employment activities, Ayres also affirms that following her resignation from NCH, she sent "one electronic mail to a recipient in Virginia, and thereafter received one telephone call from a Porchlight customer located in Virginia, with a follow-up of a few email exchanges." Ayres Aff. at ¶ 21. There are no allegations in the Complaint or the supplemental declarations submitted by NCH that any of NCH's Virginia-based customers have actually cancelled or transferred to Defendants or PorchLight any ongoing contracts or projects.[3]

Additionally, NCH claims that during the more than five years they worked for Equity,

---

[3] At most, the Complaint alleges that "Ayres and Zamecnik, individually or together with . . . former NCH National Rental Solutions employees acting under their supervision, have solicited pending NCH rental assistance projects for at least four NCH customers in Massachusetts, Pennsylvania, and other states and converted them to themselves and PorchLight." Compl. at ¶ 48.

Ayres and Zamecnik communicated with and managed Virginia-based clients, vendors, and relocating employees. *See* Panganis Aff. at ¶ 7 (cited by NCH in Opp'n at 10).

NCH does not allege that either Ayres or Zamecnik was ever personally in the Commonwealth of Virginia at any time during their employment with NCH or that any of their allegedly illegal conduct described in the Complaint actually occurred in Virginia. *See generally* Compl. at ¶¶ 33-36, 39-42, 44-45, 47-54. In this regard, NCH does not allege that Defendants solicited any Virginia-based NCH customers before they terminated their employment with NCH.[4] Rather, NCH claims that under the Virginia long-arm statute Defendants committed acts in Virginia because they used from terminals in Ohio an NCH computer system that beginning in October, 2011 had its servers located in Virginia. *See* Lakatos Aff. at ¶¶ 3, 5. NCH also points to Ayres' ownership interest in and activities related to The Warman Group LLC, a Virginia limited liability company.[5] NCH also alleges more generally that over the years, other than

---

[4]  In this regard, the Complaint conclusorily alleges only the following solicitations before Defendants' terminating their employment with NCH: "In October 2011 . . . Ayres, while an NCH employee, informed certain NCH customers at an employee relocation conference that she was leaving NCH and is believed to have solicited them to convert their rental assistance business from NCH to PorchLight." Compl. at ¶ 34.

[5]  Plaintiff alleges, supported by certain declarations, that defendant Ayres has "collaborat[ed]" with Paul Warman, a Virginia resident who is "develop[ing] a concept for a socially responsible online network called Our Care Share." Aff. of Paul Warman, filed with Opp'n, at ¶¶ 6-7. Plaintiff alleges that (1) pursuant to a September 2011 Operating Agreement for The Warman Group, which also contains Virginia choice of law and forum selection provisions for any disputes arising out of the agreement, 40% of profits and losses related to OurCareShare.com and an applied for patent are attributable to Ayres; (2) over the past several years, Ayers has engaged in approximately weekly or biweekly phone conversations with Paul Warman, a NCH employee and Virginia resident, in connection with her membership in Warman Group; (3) Ayres was given an email address on The Warman Group's email domain, which she uses to conduct business for The Warman Group; (4) Ayres' email address on The Warman Group email domain appears as the primary email contact for The Warman Group on its patent application submitted to the U.S. Patent and Trademark Office in Virginia; and (5) Ayres has drafted letters to be signed by Warman and Ayres on behalf of The Warman Group to seek support for Our Care Share. *See* Opp'n at 25-26. Ayres disputes Plaintiff's allegations. Specifically, she alleges a much less frequent contact with Mr. Warman, and minimal email or other communications with

while employed by NCH, "Ayres has made periodic trips to Virginia to solicit and conduct

business with customers and prospective customers and to attend business conferences."

Compl. at ¶ 30.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) permits dismissal of an action where the court

lacks personal jurisdiction.  The plaintiff bears the burden of demonstrating personal jurisdiction

by a preponderance of the evidence once its existence is challenged by the defendant.  *Combs v.*

*Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Lufti v. United States*, No. 1:09-cv-1114, 2011 WL

795895, at *1 (E.D. Va. Mar. 1, 2011).  If, however, as is the case here, the court decides the

jurisdictional question without an evidentiary hearing, the plaintiff need only establish a *prima*

*facie* case of personal jurisdiction.  *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993);

*Lufti*, 2011 WL 795895, at *1.  In deciding whether the plaintiff has proved a *prima facie* case,

"the court must construe all relevant pleading allegations in the light most favorable to the

plaintiff, assume credibility, and draw the most favorable inferences for the existence of

jurisdiction." *Combs*, 886 F.2d at 676; *Prod. Grp. Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788,

793 (E.D. Va. 2004).

## III. ANALYSIS

To determine whether personal jurisdiction over a non-resident defendant exists, the

Court must consider whether Virginia law authorizes personal jurisdiction;[6] and if so, whether

---

third parties about The Warman Group.  Notably, Plaintiff does not allege that Ayres was
physically present in Virginia when she undertook any of her alleged activities related to The
Warman Group, or that any of the persons with whom she communicated about The Warman
Group, other than Mr. Warman, were located in Virginia. *See* Aff. of Paul  Moreover, The
Warman Group has not generated any income. *See* Second Affidavit of Diane L. Ayres, attached
as Ex. 2 to Defs.' Reply Mem., at ¶ 8.

[6] The plaintiff asserts that there exits personal jurisdiction under Va. Code. § 8.01-328.1(A)(1)

the exercise of that authorized personal jurisdiction comports with the due process requirements of the Fourteenth Amendment to the United States Constitution. *See Consulting Eng'rs Corp. v. Geometric, Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). The Virginia long-arm statute is intended to authorize personal jurisdiction to the full extent permitted under the Due Process Clause,[7] and for that reason, the Court need only consider, with one possible qualification discussed *infra*,[8] whether the Plaintiff has made a *prima facie* showing that Defendants have constitutionally sufficient minimum contacts with Virginia.

A court may exercise either general or specific personal jurisdiction. In either case, a non-resident defendant must have "certain minimum contacts with [Virginia] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."

---

(transacting business in Virginia); (A)(3) (causing tortious injury by an act in Virginia); and (A)(4) (causing tortious injury in Virginia by an act outside of Virginia).

[7] Because Virginia's long arm statute has been construed to extend personal jurisdiction to the full extent permitted by the Due Process Clause, it has been generally stated that the "statutory and constitutional inquiries coalesce into the question of whether [the defendants] had sufficient minimum contacts with Virginia to satisfy due process requirements." *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000). *See also Consulting Eng'rs Corp.*, 561 F.3d at 277 ("Because Virginia's long-arm statute is intended to extend personal jurisdiction to the full extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry"); *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) ("Because Virginia's long arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause . . . the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one") (internal punctuation omitted).

[8] Va. Code. § 8.01-328.1(A)(4) permits the exercise of personal jurisdiction based on acts outside of Virginia only if a defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [Virginia]." There is some debate whether the personal jurisdiction authorized under this provision is more limited than that authorized under the Due Process Clause. *See First Am. First., Inc. v. National Assoc. of Bank of Women*, 802 F.2d 1511, 1517 (4th Cir. 1986) (explaining that Va. Code § 8.01-328.1(A)(4) requires a measure of "'bolstering activities' to support the exercise of jurisdiction in respect of a claim arising from out-of-state causing in-in state injury" which "may exceed [the requirements] imposed by the due process clause").

*Consulting Eng'rs Corp.*, 561 F.3d at 277. To satisfy that standard with respect to general jurisdiction, a non-resident defendant's activities must be "continuous and systematic" in the forum state and the plaintiff must demonstrate "fairly extensive" minimum contacts with that state. *See Nichols v. C.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). On the other hand, specific personal jurisdiction requires only that a non-resident defendant "purposefully directed his activities at the residents of the forum" and that the plaintiff's causes of action "arise[s] out of those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

The Plaintiff claims that Defendants engaged in conduct sufficient for this Court to exercise both general and specific jurisdiction over them and relies on the following categories of proffered facts: (1) the fact of Defendants' employment with a Virginia-based company; (2) Defendants' communications from Ohio with the Plaintiff's Virginia-based employees, customers and vendors; (3) Defendants' use from Ohio of Plaintiff's Virginia-based resources, including in particular its computer network; (4) Defendants' post-termination communications with Plaintiff's actual and prospective customers and vendors; and (5) in the case of Defendant Ayres, her travel to Virginia before her employment with the Plaintiff and her involvement with The Warman Group, LLC, a Virginia limited liability company. The Court concludes that these alleged contacts, either individually or cumulatively, do not establish either general or personal jurisdiction over Defendants in this Court.

Neither Defendant lives, works, owns real property, or pays taxes in or to Virginia. Ayres Aff. at ¶¶ 3-5, 9, 16, 19-20, 22-23; Zamecnik Aff. at ¶¶ 3-5, 9, 16, 19, 21-22. There is no claim that either Defendant travelled to Virginia during the approximately six months she was employed by the Plaintiff; and while there is some debate as to how often Ayres visited Virginia otherwise, there is no reason to think that Ayres' physical presence in Virginia was anything

other than sporadic, limited, brief and transitory. At all material times herein, the Defendants worked and lived in Ohio and while one or both may have had some managerial or supervisory responsibilities, neither was an officer, director or owner of the Plaintiff.

There is also nothing about the fact or substance of Defendants' employment with NCH that makes even a *prima facie* case of general jurisdiction. There is nothing in the record that suggests that the Defendants solicited, negotiated or agreed with NCH's purchase of their previous employer or that they negotiated or entered into any employment contracts with NCH in Virginia. (In fact, the Defendants claim that the sale violated certain contract rights they had had with the selling entity.) For this reason, it cannot be fairly said, as NCH contends, that by accepting employment in Ohio with a Virginia-based employer, the Defendants had "reached into" Virginia and availed themselves of the privilege of doing business in Virginia. *See Affinity Memory & Micro, Inc. v. K & Q Enters., Inc.*, 20 F. Supp. 2d 948, 953 n.8 (E.D. Va. 1998) (finding "who initially reached out is the significant factor" in whether contract between resident plaintiff and non-resident defendant can support personal jurisdiction).[9] Rather, it is more accurate to say that NCH "reached out" from Virginia and "into" Ohio.

Similarly, after Defendants and NCH established an employment relationship, Defendants' employment activities did not subject them to general personal jurisdiction in Virginia. Their communications with NCH's Virginia-based employees, customers or vendors during their employment with NCH originated from Ohio, were limited in number and engaged

---

[9] In *Affinity Memory*, this Court concluded that there is "little here to suggest that defendant purposefully directed its activities toward Virginia" because, with respect to the single contract that formed the basis of the cause of action and the plaintiff's jurisdictional allegations, "[n]egotiations were apparently minimal, took place over the phone, and occurred as a result of a phone call initiated by plaintiff. Moreover, defendant apparently made no attempt to develop a market in Virginia nor to establish a continuing business relationship with plaintiff." *Affinity Memory*, 20 F. Supp. 2d at 953.

in on an as-needed basis in discharge of their assigned duties, and solely in their capacity as employees of NCH, not for the purpose of entering into contracts or effecting business transactions between NCH and the Defendants. As such, these communications alone are clearly insufficient to subject the Defendants to personal jurisdiction in Virginia.[10]

Likewise, Defendants' use of NCH's computer network, which appears to create a statutory presence in Virginia based on Defendants' access of that network from their computer terminals in Ohio,[11] and Defendant Ayres' involvement with The Warman Group do not establish any real, constitutionally sufficient presence in Virginia, particularly in light of *Shaffer v. Heitner*, 433 U.S. 186 (1977). In *Shaffer*, the Supreme Court examined the constitutionality,

---

[10] Courts have generally held that communications between a non-resident defendant and the forum state of the nature and degree present here are not sufficient to establish personal jurisdiction over those non-resident defendants in the forum state. *See, e.g., Initiatives Inc. v. Korea Trading Corp.*, 991 F. Supp. 476, 479 (E.D. Va. 1997) ("telephone calls, letters, and faxes alone are insufficient to form a basis for personal jurisdiction"); *Superfos Investments Ltd. v. FirstMiss Fertilizer, Inc.*, 774 F. Supp. 393, 397-98 (E.D. Va. 1991) (citing cases). *See also Production Group Int'l v. Goldman*, 337 F. Supp. 2d 788, 796 (E.D. Va. 2004) ("[T]he mere exchange of telephone calls, faxes, and written communications with a party in Virginia also may not suffice [to warrant a finding of personal jurisdiction], although it may.") (citing *Unidyne Corp. v. Aerolineas Argentinas*, 590 F.Supp. 391, 396 (E.D. Va. 1984) (holding "telex messages and letters negotiating a transaction are insufficient to form a basis for in personam jurisdiction"), and *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir. 1982) (holding the exchange of telephone calls and letters, one of which became part of the contract sued upon, sufficient for personal jurisdiction)).

[11] Plaintiff's contention that Defendants' computer use in Ohio establishes acts in Virginia is based on Va. Code § 8.01-328.1(b), which provides that for the purpose of the long-arm statute, "using a computer or computer network within the Commonwealth of Virginia shall constitute an act in the Commonwealth." A person "uses" a computer in Virginia when he "attempts to cause a computer to perform or to stop performing computer operations." *Id.* "Computer operations" is defined broadly to include "arithmetic, logical, monitoring, storage or retrieving functions and any combination thereof" as well as "any function for which that computer was generally designed." *Id.* Based on these definitions, courts have deemed computer use to cause an act that occurs in Virginia whenever the servers for that network are located in Virginia. *See Aitken v. Communications Workers of Am.*, 496 F. Supp. 2d 653, 659 (E.D. Va. 2007) ("Virginia's long arm statute, by its terms, authorizes personal jurisdiction over [defendants] because they sent the allegedly tortious email messages to Virginia computers over Virginia servers . . . .").

under the Due Process Clause, of a Delaware statute that permits state court jurisdiction over nonresident defendants solely by virtue of their stock ownership in a Delaware corporation. *Id.* at 190-91. The Court concluded that the Delaware law "establishes only that it is appropriate for Delaware law to govern the obligations of [defendants] to [the corporation in which they held stock] and its stockholders;" stock ownership "does not demonstrate that [defendants] have 'purposefully avail(ed themselves) of the privilege of conducting activities within the forum State' in a way that would justify bringing them before a Delaware tribunal." *Id.* at 216. As the Court observed, ". . . '(i)t strains reason . . . to suggest that anyone buying securities in a corporation formed in Delaware "impliedly consents" to subject himself to Delaware's . . . jurisdiction on any cause of action.'" *Id.* at 216 (quoting Folk & Moyer, Sequestration in Delaware: A Constitutional Analysis, 73 Colum. L. Rev. 749, 785 (1973)). *See also id.* at 218 (Stevens, J., concurring) ("One who purchases shares of stock on the open market can hardly be expected to know that he has thereby become subject to suit in a forum remote from his residences and unrelated to the transaction."). Here, it cannot be said that someone who uses an out-of-state computer terminal or buys an ownership interest in a Virginia limited liability company impliedly consents to subject herself to personal jurisdiction in Virginia because the computer terminal was connected to a computer network with a server located in Virginia or the Virginia limited liability company had a presence in Virginia.

For these reasons, and after viewing the proffered facts in the light most favorable to the Plaintiff, the Court cannot conclude that Defendants' activities within Virginia were "continuous and systematic" or "fairly extensive," such that exercising general jurisdiction would not offend "traditional notions of fair play and substantial justice;" and for the above reasons, this Court easily concludes that Defendants' minimum contacts with Virginia are insufficient for a Virginia

court to exercise general jurisdiction over them.

The Court likewise concludes that the exercise of specific jurisdiction over the Defendants would not be "constitutionally reasonable." In this regard, the Court concludes that with one arguable exception pertaining to Defendants' activities after their termination of employment, discussed *infra*, none of the Defendants' relied upon activities allows the inference that Defendants intended to avail themselves of the privilege of doing business in Virginia or gave rise to Plaintiff's claims against them. *See Consulting Eng'rs Corp.*, 561 F.3d at 278 (when evaluating whether a court may exercise specific jurisdiction over a defendant, a court considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable") (internal quotations omitted).

First, all of Plaintiff's claims, in one way or another, arise out of the alleged misappropriation and use of Plaintiff's protectable information. For that reason, neither Defendant Ayres' alleged non-NCH-related visits to Virginia nor her involvement with The Warman Group has any relationship to any asserted causes of action and any Virginia contacts predicated on those activities are constitutionally irrelevant for the purpose of establishing minimum contacts sufficient to support specific personal jurisdiction. Similarly, though somewhat less obvious, Plaintiff's claims do not arise from Defendants' authorized use of the Plaintiff's computer network, or the employment relationship more generally, but from the Defendants' alleged misuse of information they properly accessed on that network, all of which took place in Ohio. There is no allegation that Defendants wrongfully accessed the computers; only that they misused the information they lawfully obtained from that system. The Plaintiff's

claims therefore do not arise out of the use of the computer system or the other resources made available to the Defendants, but rather the alleged misuse of the information at some point after that information was properly accessed by them. Nevertheless, even were this Court to assume that Plaintiff's claims arise out of Defendants' computer use, that use does not establish activity in Virginia for the purposes of the Due Process Clause, as discussed above. *See Shaffer*, discussed *supra* at 13-14.

Second, it cannot be fairly said that the Defendants' "purposely directed" their activities to Virginia for their own benefit, as opposed to their employer's benefit. As discussed above, when they established their employment relationship with NCH, they did not subject themselves to personal jurisdiction in Virginia by simply accepting employment in Ohio. Nor did they during the course of their employment. Once their employment began, they did not act in their individual capacity when interacting with Virginia-based colleagues, customers or vendors but rather acted on behalf of their employer NCH, who controlled which activities and duties were assigned to them. By simply discharging their duties as employees, Defendants were not exercising the privilege of conducting business on their own behalf in Virginia or with Virginia-based customers or vendors. Their reliance on NCH's Virginia-based infrastructure was for the purpose of pursuing NCH's business objectives, not their own, and they were therefore not "availing themselves of the privilege of conducting activities in the state," particularly in light of the facts and circumstances surrounding their becoming NCH employees in the first place, and the passive role they played with respect to the events that resulted in their becoming NCH employees. Significant in this regard is that there is no claim that either Defendant solicited a Virginia-based customer before terminating the employment relationship. *See, supra*, at n.5. *See also D'Addario v. Geller*, 264 F. Supp. 2d 367, 380-81 (E.D. Va. 2003) (citing rule that "[a]

corporate agent is not subject to personal jurisdiction in his individual capacity under the long-arm statute solely based upon his status as a corporate officer or agent" but finding exercise of jurisdiction proper because the "defendants allegedly committed acts under the guise of acting on behalf of and for the benefit of the corporation, when, in point of fact, the acts were allegedly for personal gain" and thus, "defendants cannot hide behind a 'fiduciary shield' to avoid personal jurisdiction"). The Court is cognizant that in order to satisfy due process for the purposes of exercising specific jurisdiction, Defendants' contacts with Virginia need not be extensive. Nevertheless, "the 'fair warning' requirement inherent in due process still demands that the defendant 'purposely directed' its activities at the forum." *Federal Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 660 (4th Cir. 1989) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984)). Here, Defendants never had "fair warning" that by doing their jobs in Ohio they could be sued in Virginia.

Plaintiff does allege that while still employees, Defendants, acting in Ohio, briefly disabled NCH's access to its computer network in anticipation of leaving NCH and competing with it. It also alleges that after they terminated the employment relationship, Defendants solicited NCH customers located in Virginia using proprietary and confidential information, including registered trademarks, and made defamatory statements against NCH, and thereby interfered with actual and prospective contracts with actual and prospective customers. These allegations are for the most part conclusory, without any real factual content as far as what protectable information was used by Defendants (who had no restrictive use, non-solicitation or non-compete agreements with NCH) to solicit which actual or prospective contracts from which actual or prospective customers. Nevertheless, these allegations, if accepted as true, raise the possibility that specific jurisdiction might exist pursuant to Section (A)(4) of the Virginia long-

17

arm statute, which authorizes the exercise of personal jurisdiction under certain conditions where out-of-state conduct causes in-state injuries.  The Court need not determine, however, whether NCH has made a *prima facie* case with respect to those conclusory allegations since, even if NCH's has, for the purposes of these allegations, stated a claim sufficient under *Bell Atlantic Corp. v. Twombly*, 530 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and even were Defendants' contacts with Virginia constitutionally sufficient to satisfy the Due Process Clause as to this type of specific jurisdiction, the Plaintiff has not made a *prima facie* showing that either Defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth," as Virginia's long arm statute requires.  Va. Code § 8.01-328.1.A(4).

The Court's conclusion that it does not have personal jurisdiction over the Defendants is not inconsistent with this Court's decision in *Production Group International, Inc. v. Goldman*, heavily relied on by the Plaintiff.  In *Production Group*, a Virginia-based company brought suit in Virginia against a Florida-based former employee for breach of written non-solicitation and confidentiality agreements, 337 F. Supp. 2d at 792, alleging three categories of contacts between the defendant and Virginia: (1) the defendant's acceptance of employment with a Virginia-based company by signing a contract drafted and sent from Virginia, and which resulted in part from an interview of the defendant by a Virginia-based employee of the plaintiff participating by phone from Virginia; (2) the defendant's regular communications with Virginia-based colleagues in the course of performing his employment contract; and (3) the defendant's three trips to the plaintiff's Virginia headquarters, also in the course of performing his employment contract.  As the Court noted, "[e]ach of these contacts, taken individually, might well be insufficient to

warrant a finding of personal jurisdiction[,]" 337 F. Supp. 2d at 796, "[y]et, when . . . viewed *as a whole*, there is little doubt that they amount to a *prima facie* showing of 'transacting business' for jurisdictional purposes," *id.* at 796. In contrast with the *Production Group* defendant, Defendants' contacts, either individually or taken as whole, do not establish a *prima facie* case that these defendants transacted business in Virginia. Neither Ayres nor Zamecnik sought out or solicited a contract with their Virginia-based employer or entered into a contract in Virginia or even visited Virginia in the course of performing her employment with NCH.[12]

Plaintiff also attempts to place this case within the holdings of two other Fourth Circuit cases, *English & Smith v. Metzger*, 901 F.2d 36 (4th Cir. 1990), and *Peanut Corp. of America v. Hollywood Brands, Inc.* In *English & Smith*, the defendant, who acted in his individual capacity, not as an agent or employee of the plaintiff, was considered to have "transacted business" in Virginia by virtue of defendant's having

> initiated the relationship with [plaintiff] Smith, knowing that Smith was a Virginia lawyer who likely would do the requested work in Virginia . . . [and] . . . contracted with Smith in Virginia, first by telephone and later in a writing that Smith, as the last party to sign, executed in Virginia. Smith performed all of his duties under the contract in Virginia. Finally, the parties exchanged numerous telephone calls and written communications. Few examples of transacting business are more classic than defendant Metzger's decision to associate a Virginia law firm on a case and his subsequent dealings with that firm.

901 F.2d at 39. The Fourth Circuit in *English & Smith*, having found the defendant to have "transacted business in the Commonwealth," proceeded to analyze whether the exercise of personal jurisdiction comported with "traditional notions of fairness." On that point, the Fourth Circuit held that this "purposeful direction of activities toward the forum" was present, based on the following facts: (1) the defendant initiated contact with plaintiff in Virginia; (2) the defendant

---

[12] Zamecnik is not alleged to have ever visited Virginia and while Ayres is alleged to have visited Virginia on several occasions, Plaintiff offers nothing to dispute Ayres' claim that those trips occurred prior to her employment with NCH.

entered into contracts with plaintiff as a result of activities in Virginia; and (3) the defendant carried on a continuing relationship with plaintiff in Virginia pertaining to other matters.  As a result of these facts, the Court held that the defendant's "intentional contacts with the State were enough that he could 'reasonably anticipate being haled into court there.'"  *Id.* at 40 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  The facts in this case are materially different than those found dispositive in *English & Smith*.

NCH also cites *Peanut Corp.*  There, the Court held that the extensive contract negotiations that occurred in Virginia were sufficient "to amount to the transaction of business" including (1) a modification letter, which became a part of the contract and which was addressed to and received by one of the plaintiffs in Virginia; (2) telephonic negotiations over the contract that occurred with one of the parties participating by phone from Virginia; and (3) numerous written communications between the parties that were sent to and received in Virginia.  696 F.2d at 314.  Moreover, the Court concluded that the defendant "purposely avail[ed] [himself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws," citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), by (1) the defendant's soliciting business throughout Virginia using manufacturers' representatives and numerous forms of advertising; (2) the defendant's direct billing of Virginia-based customers; (3) the defendant's distributing products to two "break-down" points in Virginia; and (4) the defendant's regularly contacting Virginia peanut concerns.  *Peanut Corp.*, 696 F.2d at 314.  Here, there is no contention that any employment contract negotiations took place wholly or partially in Virginia or that Defendants engaged in business activities comparable to those in *Peanut Corp.*

Unlike the defendants in the cases relied on by NCH, Ayres and Zamecnik found

themselves, through no effort or decision of their own, suddenly involved with a Virginia-based corporate employer not of their choosing, for whom they could either continue doing what they had been doing or render themselves suddenly unemployed. Under these circumstances, Defendants cannot be said to have had "fair warning" that by accepting employment with NCH and remaining in Ohio to perform their jobs, they were now subject to being sued in Virginia. Ultimately, as in *Shaffer*, it "strains reason . . . to suggest" that by passively accepting employment with NCH, discharging their employment duties from Ohio in the ordinary course of business, or using a computer terminal in Ohio, Defendants "impliedly consented" to subject themselves to jurisdiction in Virginia. 433 U.S. at 216 (citations omitted). To find the exercise of jurisdiction proper over Defendants here would subject unsuspecting employees of companies sold to out-of-state entities to personal jurisdiction in whatever state their new corporate employer is located. In today's economy, in which business combinations are commonplace and often neither locally-based nor undertaken with any employee knowledge or participation, subjecting employees to suit in a foreign jurisdiction, as NCH proposes here, would offend traditional notions of fair play and substantial justice.

## IV. CONCLUSION

For the above reasons, NCH has failed to make a *prima facie* case of either general or specific personal jurisdiction over Defendants, and, accordingly, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is granted and Plaintiff's Complaint is dismissed.

An appropriate Order will issue.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 28, 2012

21